# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ANNA MAE COLLICK, )
                            )
           Plaintiff, )
                            )
         v. )           C.A. No.: 11-347-GMS
                            )
MICHAEL J. ASTRUE,[1] )
COMMISSIONER OF SOCIAL )
SECURITY, )
                            )
         Defendant. )

## MEMORANDUM

## I.    INTRODUCTION

On February 20, 2012, plaintiff Anna Mae Collick ("plaintiff") instituted this action seeking judicial review of the final decision of the Commissioner of the SSA ("defendant") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433, 1381-1383.

Plaintiff first applied for DIB and SSI on May 14, 2007. (D.I. 12 at 99-110.) Her applications were denied initially and on reconsideration. Subsequently, she timely filed a request for a hearing before an administrative law judge. (*Id.* at 60-64, 66-78.) On June 10, 2008, plaintiff, who was represented by counsel, appeared and testified at a

---

[1] Carolyn W. Colvin became the Commissioner (the "Commissioner") of the Social Security Administration (the "SSA") on February 13, 2013, after briefing began. Although, under FED. R. CIV. P. 25, Carolyn W. Colvin should be substituted for Michael J. Astrue, pursuant to 42 U.S.C. § 405(g), no further action is necessary to continue this action.

hearing before ALJ Barbara Powell ("ALJ"). (*Id.* at 22-55.) On May 28, 2009, the ALJ issued an adverse decision. (*Id.* at 6-21.) The Appeals Council subsequently denied review (*id.* at 1-3), making the ALJ's adverse decision final. 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481 (2012); *Sims v. Apfel*, 530 U.S. 103, 107 (2000); *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).

In 2010, plaintiff first sought judicial review of the ALJ's decision before this court, which granted defendant's motion to remand. (D.I. 18 at 1; D.I. 12 at 406.) The Appeals Council found no basis for changing the ALJ's decision, leading to plaintiff's present appeal. (D.I. 12 at 406-07.)

Under consideration are the parties' cross-motions for summary judgments. This court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the court will grant defendant's motion and deny plaintiff's motion.

## II. BACKGROUND

### A. Plaintiff's Medical Records

In support of her DIB and SSI applications, plaintiff submitted medical records documenting back and leg pain, depression, fatigue, day-time somnolence, and sleep apnea.

#### 1. Back and leg problems

On February 2, 2003, plaintiff saw Dr. Arnold B. Glassman, D.O. ("Dr. Glassman"), who diagnosed an L4-L5 disc herniation, but ruled out left L4-L5 radiculopathy. Although her lumbar spine was normal and she could flex her trunk to almost 80 degrees, plaintiff complained of back pain and tightness. (D.I. 12 at 230.) In

2

November 2004, Dr. Grossman diagnosed left L4-L5 radiculopathy. (*Id.* at 227.)

Plaintiff first saw Dr. Khalil F. Gorgui, M.D., her primary care physician ("Dr. Gorgui"), in March 2007. His notes indicate spinal tenderness on palpation. (*Id.* at 345.) In May 2008, plaintiff visited Dr. Gorgui for leg cramps. (*Id.* at 348.) His notes of her subsequent visits do not document back or leg cramp symptoms. (*Id.* at 347-49, 403-04.)

From March 2007 to October 2007, plaintiff received treatment from Dr. Richard J. Sternberg, M.D. ("Dr. Sternberg"). (*Id.* at 261-75, 295, 297, 300-01.) His initial clinical examination revealed some limitation in the range of motion and tenderness at the right sciatic notch. (*Id.* at 309.) During the March 2007 visit, Dr. Sternberg recommended that plaintiff refrain from work, with her return to work date "pending." (*Id.* at 308.) His subsequent treatment notes document only subjective complaints. (*Id.* at 295, 297, 300-01.)

In July 2007, plaintiff began treatment with Dr. Mano Antony, M.D. ("Dr. Antony"), who reported an antalgic gait, lower lumbar facet tenderness, diminished range of motion, and positive straight leg raising. (*Id.* at 282.) His diagnoses were lumbar facet syndrome and chronic lumbar radiculopathy. (*Id.*) Dr. Anthony prescribed epidural steroid injections to relieve back pain, which were administered in July and August 2007. (*Id.* at 296, 298.)

An MRI of March 3, 2007 revealed mild bulging at L5-S1 and a small broad-based L4-5 disk herniation. (*Id.* at 251.) The electromyography administered in May 2007 showed all nerve segments to be within normal limits with no lumbar or peripheral

3

nerve compromise. (*Id.* at 254.)

In her Disability Report of May 2007, plaintiff noted she could walk for eight hours, stand for seven hours, reach for six hours, handle and grab large objects for five hours, stoop and kneel for four hours, and type and handle small objects for one hour. She reported an inability to climb, crawl, or crouch. (*Id.* at 135.)

In her Function Report of July 2007 (the "Function Report"), she claimed her back problems affected her ability to lift, carry, stand, walk, sit, climb stairs, bend, kneel, and use her hands. Plaintiff did not report any effect on her ability to crawl and reach. (*Id.* at 152.) She allegedly could walk or stand zero hours and had to change body position every hour, but she could frequently lift ten pounds and occasionally bend and reach her arms up and out. (*Id.* at 153.) She stated she shopped for groceries twice a month and occasionally for clothing. (*Id.* at 161.)

On August 28, 2007, K. Sarpolis, M.D., a state agency medical consultant ("Dr. Sarpolis"), completed a Physical Residual Functional Capacity Assessment form (the "PRFCA"). Dr. Sarpolis opined that plaintiff had a residual functional capacity consistent with sedentary work, could frequently lift and carry ten pounds, stand and walk at least two hours and sit about six hours in an eight-hour workday, and push and pull without limitation. (*Id.* at 256.) Dr. Sarpolis also found plaintiff could frequently balance and occasionally stoop, climb stairs, kneel, crouch, and crawl, but could not climb ladders or ropes. (*Id.* at 258.) On November 29, 2007, J. Acuna, M.D., another state agency medical consultant, affirmed Dr. Sarpolis's findings. (*Id.* at 275.)

In February 2008, plaintiff was evaluated by orthopedist John J. Greko, M.D.

4

("Dr. Greko"). (*Id.* at 339-40.) Her complaints included general pain with any range of motion of lumbar spine, pain on palpation of the lumbar region, the buttocks, and both hips, and weakness in the hips and legs in a seated position. (*Id.* at 339.) She exhibited no difficulty with heel and toe walking, no leg muscle atrophy, and normal knee and ankle reflexes. (*Id.*) Dr. Greko advised against a back surgery and recommended continuation of her pain management regiment. (*Id.*) There is no evidence that she sought a second opinion regarding surgery.

The record contains a number of emergency room discharge papers documenting plaintiff's subjective back pain complaints. (*Id.* at 234, 238.) She continued to receive treatment for back pain after the administrative hearing. The emergency room discharge papers from August 22, 2008 instructed to avoid an underactive life style and apply heat and ice to relieve back pain. (*Id.* at 375.) In May 2008, plaintiff again received epidural steroid injections. (*Id.* at 401.)

### 2. Dysthymia

Plaintiff added a claim for depression to her DIB and SSI applications of October 25, 2007. (*Id.* at 171.) On November 28, 2007, she clarified that she was not presently receiving treatment for depression, but had undergone some medical treatment and counseling for this condition in the past. (*Id.* at 178.) The SSA report notes she "did not list any limitations attributable to a mental impairment on her ADL form," and concludes "[a] severe mental impairment that would cause [plaintiff] any significant limitations at this time is being ruled out." (*Id.* at 179.)

In March 2008, she complained to Dr. Gorgui of suffering from post-traumatic

stress disorder "for years." (Id. at 347.) He prescribed anti-depressant medications, Celexa and Elavil, and recommended that she see a psychologist. (Id.) Her second Disability Report of March 2008 stated she suffered from an on-going depression. (Id. at 185.)

In January, March, and May 2008, plaintiff completed several forms and self-assessment questionnaires for the Delmarva Counseling Center. (Id. at 319-38.) Despite her contentions of receiving counseling from Dr. Beatrice H. Hamilton ("Dr. Hamilton") at the Delmarva Counseling Center (id. at 37), the record does not contain treatment notes from Dr. Hamilton or any other mental health provider.

In August 2008, following the hearing before the ALJ, plaintiff underwent a psychological evaluation by Joseph B. Keyes, Ph.D. ("Keyes"). (Id. at 360-70.) He advised undergoing counseling and taking Celexa and Amitriptyline for depression, but omitted that she had been abused as a child. (See id. at 360-61.) She reported that she did not trust others and was irritable. (Id.)

According to Keyes, plaintiff's demeanor, orientation, mental alertness, and memory were within normal limits, and her speech was clear. (Id. at 364.) His testing indicated adequate cognitive functioning. (Id.) She had mild limitation in such areas as carrying out complex instructions, interacting appropriately with the public, supervisors, and co-workers, and responding to changes in a routine work setting. (Id. at 366-67.) She had no limitation in understanding, remembering, and carrying out simple instructions. (Id. at 366.) Her Global Assessment of Functioning ("GAF") was rated at

60.[2]  (*Id.* at 365.)  The results of the Minnesota Multiphasic Personality Inventory-2 were found invalid because of her extremely inconsistent responses.  (*Id.* at 363-64.)  Keyes diagnoses included dysthymic disorder, alcohol dependence (full remission), and cocaine dependence (full remission).  (*Id.* at 364.)  Plaintiff received a copy of Keyes' report on or before September 24, 2008.  (D.I. 18-2 at 1.)

### 3.  Sleep apnea and sleep disturbance[3]

Plaintiff first complained that her back condition affected her sleep in her Function Report of July 2007.  (D.I. 12 at 156.)  During an emergency room visit on August 22, 2008, her respirations were not labored, and she denied any dizziness, fatigue, or sleep disturbance.  (*Id.*  at 372, 389.)  On September 8, 2008, she saw Dr. Gorgui for cold-like symptoms and complained of shortness of breath and was diagnosed with an upper respiratory infection.  (*Id.* at 404.)  Plaintiff explicitly denied having breathing problems in her Disability Reports.  (*Id.* at 131.)

On November 21, 2008, almost two months after receiving a copy of Keyes' post-hearing report, plaintiff represented to the ALJ that she had undergone a sleep

---

[2] The GAF is a scale ranging from zero to one hundred developed for use by mental health professionals for expressing an adult's psychological, social, and occupational functions.  A GAP score of 61 to 70 indicates an individual only has "some mild" symptoms or only "some" difficulty in social, occupational, or school functioning but generally functions "pretty well" and has some meaningful relationships.  A score of 51 to 60 indicates mild symptoms or moderate difficulty in social, occupational, or school functioning.  AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS–TEXT REVISION 34 (4th ed. 2000).

[3] Sleep apnea is a "periodic cessation of respiration associated with hypoxemia and frequent arousals from sleep."  20 C.F.R. § 404, Subpart P, app. 1.  It may be associated with (1) chronic cor pulmonale disorders and chronic pulmonary hypertension, (2) day-time somnolence, or (3) disturbances in cognitive function.  *See* § 404, Subpart P, app. 1.

7

study at the Nanticoke Memorial Hospital on October 20, 2008. (*Id.* at 396.) In support, she submitted an unsigned neuropulmonary report on the Nanticoke Memorial Hospital letterhead that noted diagnoses of obstructive sleep apnea, abnormal multiple sleep latency, and excessive daytime somnolence and recommended that she undergo a second sleep study and receive CPAP treatment. (*Id.* at 397.)

### 4. Medications

The record shows that from March 2007 to April 2008, plaintiff was regularly prescribed Erythromycin, Hydorcodone, Napoxen, Tizanadine, Lyrica, Oxycodon, Endocet, Amoxicillin, Claritin-D, Omnicef, Cheratussin, Carisoprodol, Azithromycin, Amitriptylin, and Citalopram. (*Id.* at 194-96.)

## B. Hearing Testimony

### 1. Plaintiff's testimony

On June 10, 2008, plaintiff testified about debilitating back and leg pain, radiating from her neck to her legs. (*Id.* at 35.) She claimed that any daily postural exertions such as bending, stooping, crawling, crouching, and climbing stairs caused pain for the past three to four years. (*Id.* at 30.) She could not lift a gallon of milk from the floor or pull laundry from the dryer. (*Id.* at 42.) Her back would sometimes "lock up" leading to emergency room visits. (*Id.* at 35.)

Plaintiff stated she cooked, regularly cleaned her house, did some laundry and grocery shopping, occasionally drove, attended church every week, and read. She handled her everyday grooming without assistance and cared for her grandchildren and her dog. She also stated that she could only walk eight blocks. (*Id.* at 32-33.)

8

Plaintiff claimed being depressed, fatigued, anxious, exhausted, isolated, and unable to sleep at night. (*Id.* at 34-36.) She believed that her pain and anti-depressant medications caused fatigue, exhaustion, and day-time somnolence. (*Id.* at 39.) She testified that Dr. Hamilton's counseling sessions helped the depression, bi-polar disorder, anxiety, and post-traumatic stress. (*Id.* at 37.) She stated that these mental disorders existed since she was a minor. (*Id.* at 43-45.)

## 2. Unique S. Coles' testimony

Unique S. Coles, plaintiff's daughter ("Coles"), testified that she visited her mother every day and confirmed her depression and isolation. She further observed that medications caused plaintiff to be groggy. (*Id.* at 48-49.)

## 3. Vocational expert's testimony

Jan Howard-Reed, an independent vocational expert (the "VE"), testified that plaintiff could not return to her previous jobs as a cook, a deboner, or a box packer. (*Id.* at 50-51.) The ALJ posed two hypotheticals to the VE. The first one adequately reflected plaintiff's credibly alleged limitations. (*Id.* at 51.) The second hypothetical incorporated all of plaintiff's subjective complaints. The VE stated that 400 jobs locally and between 70,000 and 90,000 jobs nationally existed for a person as described in the first hypothetical. She further testified that there were no jobs in the national economy for a person as described in the second hypothetical. (*Id.* at 51-53.)

## C. The ALJ's Findings

The ALJ followed the standard five-step procedure to determine whether plaintiff was disabled. Her findings may be summarized as follows:

9

1.  Plaintiff meets the insured status requirements of the Act through December 21, 2009.
2.  Plaintiff has not engaged in substantial gainful activity since February 7, 2007, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
3.  Plaintiff has the following severe impairments: degenerative disc disease and a mood disorder–dysthemia (20 C.F.R. §§ 404.1520(c) and 416.920(c)). A sleep disorder is a non-severe impairment.
4.  Plaintiff does not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, app. 1 (20 C.F.R. §§ 404.1525, 404.1526 and 416.926).
5.  Plaintiff has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), lifting up to ten pounds, standing or walking two hours a day, and sitting six hours, except that she can only occasionally balance, climb, stoop, kneel, crouch, or crawl, and she is limited to unskilled work due to pain, depression, and effects of medication.
6.  Plaintiff is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).
7.  Plaintiff was born on January 28, 1964 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).
8.  Plaintiff has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).
9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is not disabled, whether or not she has transferable job skills (*see* S.S.R. 82-41 and C.F.R. Part 404, Subpart P, Appendix 2).
10. Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform (20 C.F.R. §§ 404.1569, 404.1569a, 416.969, and 416.969a).
11. Plaintiff has not been under a disability, as defined in the Act, from February 7, 2007 through the date of the ALJ's decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(*Id.* at 11-21.)

## III.  STANDARD OF REVIEW

### A.  Motion for Summary Judgment

A court may grant a motion for summary judgement if it "determine[s] that 'there is no genuine issue as to any material fact' and that the movant is entitled to judgment as a matter of law." *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under the applicable rule of law. *Id.*

In its determination, the court must review the record as a whole, "draw[ing] all reasonable inferences in favor of the nonmoving party, [but] it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *see also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 329–30 (3d Cir. 1995) (same).

The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

When ruling on cross-motions for summary judgment, the court must consider

11

the motions independently and view the evidence on each motion in the light most favorable to the party opposing the motion. *See Williams v. Philadelphia Hous. Auth.*, 834 F.Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). "The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party." *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

## B. Review of the ALJ's Findings

District courts exercise plenary review over all questions of law in DIB and SSI appeals. *Allen v. Barnhart*, 417 F.3d 396, 398 (3d Cir. 2005); *see also Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 857 (3d Cir. 2007) ("plenary review over the legal issue of whether the SSA's conduct violated fundamental fairness"). A district court's review of an ALJ's factual findings is limited: it must uphold the ALJ's factual findings if they are supported by "substantial evidence." 42 U.S.C. § 405(g).

Substantial evidence "does not mean a large or considerable amount of evidence . . . ." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Rather, it is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.

12

1983).

The substantial evidence standard does not allow the court to re-weigh the evidence on the record. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (deferential review of factual findings). The substantial evidence standard also limits review to the factual evidence actually presented to the ALJ. See Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001) ("No statutory provision authorizes the district court to make a decision on the substantial evidence standard based on the new and material evidence never presented to the ALJ."). Even if the court would decide the case differently, it must defer to the ALJ and affirm so long as the ALJ's decision is supported by substantial evidence. Monsour Med. Ctr., 806 F.2d at 1190-91.

The ALJ's decision cannot be affirmed on a ground other than that actually relied upon in making the decision. See Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 196 (1947); Hansford v. Astrue, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011). In Chenery, the U.S. Supreme Court explained that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." Chenery, 332 U.S. at 196; see also Fargnoli v. Massanari, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (the Chenery standard applies in the SSA disability context).

IV. **DISCUSSION**

13

## A. Due Process

Plaintiff asserts that the ALJ was openly hostile and biased against her during the administrative hearing and mishandled Keyes's post-hearing report, thereby depriving her of due process rights.

### 1. Waiver of bias

Plaintiff argues she was denied a fair hearing because of bias, purportedly evident from the ALJ's conduct toward her and her counsel. (D.I. 18 at 16.) Because of the alleged bias, plaintiff demands remand for a new administrative hearing before a different ALJ. (*Id.* at 16.)

Due process requires that administrative hearings be full and fair. *Ventura*, 55 F.3d at 902 (citing *Richardson*, 402 U.S. at 400-01). The right to an unbiased ALJ is essential to a fair hearing, and bias may constitute grounds for reversal of a decision adverse to the claimant. *Hummel v. Heckler*, 736 F.2d 91, 93, 95 (3d Cir. 1984).

A claimant objecting to an ALJ presiding over a hearing on the grounds of bias must notify that ALJ at the earliest opportunity to allow review of the recusal request. 20 C.F.R. §§ 404.940; 416.1440. If the recusal motion is denied, the claimant may, after the administrative hearing, "present objections to the Appeals Council as reasons why the hearing decision should be revised or a new hearing held before another [ALJ]." §§ 404.940; 416.1440.

The term "the earliest opportunity" means as soon as practicable after the claimant becomes aware of the ALJ's bias. *Hummel*, 736 F.2d at 94. The decision in *Hummel* is on point. There, the Third Circuit found that the claimant properly asserted

14

bias before the district court because she learned of the ALJ's potential prejudice after
the issuance of an adverse decision. *Id.* at 94-95. The court explained, however, that if
the claimant had "been aware of the facts giving rise to her claim of bias" at the time of
the administrative hearing, she would have waived that claim under 20 C.F.R.
§ 416.1440. *Id.* at 94.

Here, waiver precludes plaintiff's bias claim under §§ 404.940 and 416.1440 for
failing to object at her earliest opportunity. The alleged bias occurred at the
administrative hearing on June 10, 2008, almost a year before the adverse decision
was rendered and fourteen months before plaintiff first raised this claim before the
Appeals Council on August 17, 2009. (D.I. 18-1 at 2.) Plaintiff's understanding of her
post-hearing rights is evident from her objection to the admission of Keyes' findings into
the record and her request to cross-examine him, made three and a half months before
the adverse decision. (*Id.* at 3.) Following the remand by this court in 2010, the
Appeals Council invited plaintiff to submit additional evidence or contentions and found
no basis for modifying the ALJ's decision. (D.I. 12 at 406-07.) For these reasons,
remand of this matter to a different ALJ is not warranted.

### 2. The handling of the post-hearing evidence

Plaintiff argues for remand because the ALJ violated the SSA's HALLEX[4]

---

[4] HALLEX defines procedures for implementing the SSA's policy and provides
guidelines for processing and adjudicating claims at the administrative hearing, Appeals
Council, and other levels. *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 857 n.7
(3d Cir. 2007). Under HALLEX, the ALJ must proffer all post-hearing evidence to the
claimant. HALLEX § I-2-7-30(A) (S.S.A. Sept. 2, 2005). The notice must "[g]ive the
claimant a time limit to . . . exercise his or her rights with respect to requesting a
supplemental hearing and the opportunity to cross-examine" the authors of any post-
hearing reports "*if it is determined by the ALJ that such questioning is needed* to inquire

15

regulations by failing to rule on plaintiff's request to cross-examine Keyes and to notify her of her right to a supplementary hearing. (D.I. 18 at 13.) Defendant counters that the HALLEX provisions lack the force of law. (D.I. 22 at 20.)

The Third Circuit does not recognize HALLEX as an independent source of the ALJ's legal duties. See Bordes, 235 F. App'x at 859 ("HALLEX provisions . . . lack the force of law and create no judicially-enforceable rights."). However, "ALJs have a duty to develop a full and fair record in social security cases" according to the C.F.R. standards. See Ventura, 55 F.3d at 902. This duty, inter alia, forbids ALJs from "rely[ing] on post-hearing reports without giving the claimant an opportunity to cross-examine the authors of such reports, when such cross-examination may be required for a full and true disclosure of the facts." Wallace v. Bowen, 869 F.2d 187, 191-92 (3d Cir. 1989); see also 20 C.F.R. § 404.916.[5]

Here, the ALJ's handling of the post-hearing evidence was not improper. When

_____

fully into the issues." § I-2-7-30(B) (emphasis added).

[5] In the pertinent part, the 20 C.F.R. § 404.916(f) ("Opportunity to review and comment on evidence obtained or developed by us after the hearing") states:

> If, for any reason, additional evidence is obtained or developed by us after your disability hearing, and all evidence taken together can be used to support a reconsidered determination that is unfavorable to you with regard to the medical factors of eligibility, we will notify you, in writing, and give you an opportunity to review and comment on the additional evidence. You will be given 10 days from the date you receive our notice to submit your comments (in writing or, in appropriate cases, by telephone), unless there is good cause for granting you additional time . . . . Your comments will be considered before a reconsidered determination is issued. If you believe that it is necessary to have further opportunity for a hearing with respect to the additional evidence, a supplementary hearing may be scheduled at your request. Otherwise, we will ask for your written comments on the additional evidence, or, in appropriate cases, for your telephone comments.

20 C.F.R. § 404.916(f).

the ALJ forwarded Keyes' post-hearing report to plaintiff's counsel on September 22, 2008, she advised that plaintiff had a right to submit written comments concerning the post-hearing evidence, a written statement of the applicable facts and law in light of that evidence, any additional records for consideration, and written questions directed to Keyes. (D.I. 18-3 at 1.) The ALJ also adequately notified plaintiff of her right to request a supplementary hearing and to cross-examine Keyes. The ALJ specifically advised she would assume that plaintiff intended not "to submit any written statements or records or to orally question" Keyes if plaintiff or her counsel did not respond within ten days. (Id.)

In her two-paragraph long response on September 24, 2008, plaintiff objected to the admission of Keyes' report solely because "his clinical exam of [plaintiff] was extremely abbreviated and did not adequately explore her mental health history." (D.I. 18-2 at 1.) Plaintiff failed to advance a legal argument or identify medical reports undermining Keyes' report. She did not proffer additional medical records of mental or cognitive impairments, nor did she submit a list of proposed questions—the strongest indicator that cross-examination of Keyes may be necessary. In contrast, the ALJ sufficiently addressed plaintiff's objection to the admission of Keyes' report in her assessment of its credibility and weight. (D.I. 12 at 18.)[6] Additional medical records, forwarded by plaintiff's counsel to the ALJ on November 21, 2008, did not contradict Keyes' report because they advised that plaintiff was diagnosed with sleep apnea and was receiving treatment for herniated disc. (Id. at 396-405.)

---

[6] See infra Part IV.B.

17

For these reasons, the court finds no violations of plaintiff's due process rights and denies her request to remand this matter to a different ALJ.

## B. The ALJ's Credibility Determinations

Plaintiff argues the ALJ's credibility findings were unjustified. (D.I. 18 at 13.) Defendant asserts that substantial evidence supports the ALJ's credibility determinations. (D.I. 22 at 13.)

Credibility determinations are the province of an ALJ; a district court may disturb them on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, C.A. No. 00-1309, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Hom v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). When the record contains conflicting evidence, the ALJ "is not only entitled but required to choose" between such evidence. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). An ALJ "'cannot reject evidence for no reason or for the wrong reason,'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993)), and must explain why the evidence has been rejected. *Cotter*, 642 F.2d at 706-07.

The ALJ may reject allegations of subjective symptoms that lack support of objective medical evidence. *See Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 618 (3d Cir. 2009). The ALJ may reject a medical opinion of a treating physician "only on the basis of contradictory medical evidence, but may afford [it] more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429. A treating physician's opinion may not be rejected because of the ALJ's own credibility judgments, speculation, or lay opinion. *See, e.g., id.*

Here, substantial evidence supports the ALJ's credibility determinations.

18

Plaintiff's subjective testimony was not entirely credible because it was inconsistent. As the ALJ noted, plaintiff's self-assessment of back and lower extremities pain changed several times: she reported an ability to stand or walk for "zero" hours in 2007, but reported walking several blocks for exercise in 2008. (D.I. 12 at 17; *see also id.* at 34.) The ALJ also noted that plaintiff failed the Minnesota Multiphasic Personality Inventory-2 test used to measure her psychopathology and personality functioning because she "tended to answer items true regardless of context." (*Id.* at 18-19; *see also id.* at 364.) In addition, plaintiff denied ever suffering from alcoholism or using alcohol and recreational drugs on her Delmarva Counseling Center self-assessment forms in January and March 2008, but admitted cocaine and alcohol dependence to Keyes. (*Id.* at 18; *see also id.* at 322, 324.)

Inconsistencies alone in plaintiff's testimony did not lead to its rejection by the ALJ. Rather, the ALJ assigned weight to plaintiff's testimony proportional to the objective medical evidence in the record. The ALJ accepted plaintiff's account of back· pain, difficulties bending forward and lifting, except when contradicted by the PRFCA and MRI results. (*Id.* at 15-17.) The ALJ credited her testimony of fatigue and daytime somnolence due to pain and anxiety medications. (*Id.* at 17.) The ALJ, however, discounted plaintiff's representations of *debilitating* depression because the record showed only minimal medical treatment for this condition. (*Id.* at 17-18.)

The ALJ also adequately explored the conflicting objective evidence in the record. When assessing plaintiff's back and leg pain, she accepted the PRFCA showing plaintiff's ability to perform sedentary work and rejected Dr. Sternberg's conclusory and ambiguous note that plaintiff was unable to work. (*Id.* at 16-17.) As the

ALJ explained, Dr. Sternberg did not describe any specific functional limitations and failed to note work restrictions in his later treatment records. (*Id.* at 16.) Analyzing plaintiff's dysthymia claim, the ALJ distinguished between pre-hearing counseling records and Keyes' diagnosis and explained that Keyes' report was credible "to the extent it is consistent with [plaintiff's] residual capacity for unskilled work." (*Id.* at 19.) The ALJ emphasized that "[t]he extreme symptoms and history of abuse detailed . . . to her psychologist five months before [Keyes'] examination are not reflected in his report." (*Id.*)

For these reasons, the court finds the ALJ's credibility findings were based on substantial evidence.

## C. The ALJ's Disability Determination

Plaintiff submits that the ALJ erred when she found no disability despite severe back pain, determined sleep apnea to be a non-severe impairment, failed to consider sleep apnea in combination with other impairments and ignored the VE's answers to the second hypothetical. (D.I. 18 at 13-15; D.I. 23 at 1.) Defendant counters that the ALJ's evaluation conformed with the regulations. (D.I. 22 at 13.) The parties agree that plaintiff has not engaged in substantial gainful activity since February of 2007 and could not return to her past work. (D.I. 12 at 11, 19.)

Under the Act, an ALJ must follow the SSA's five-step sequential evaluation process to determine whether a claimant suffers from a physical or mental disability. *Fraser v. Astrue*, 373 F. App'x 222, 224 (3d Cir. 2010). In her determination, the "ALJ must review: (1) the claimant's current work activity; (2) the medical severity and duration of the claimant's impairments; (3) whether the claimant's impairments meet or

20

equal the requirements of an impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to return to past relevant work; and (5) if the claimant cannot return to past relevant work, whether he or she can 'make an adjustment to other work' in the national economy." *Id.* (citing 20 C.F.R. § 404.1520(a)(4)(i)–(v)). "The claimant bears the burden of proof on steps one through four." *Id.* The Commissioner bears the burden of proof at step five. *Id.*

### 1. Step two

To meet the requirement of "severe impairment," the claimant must show that the "impairment or [a] combination of impairments . . . significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c). When assessing severity of a combination of impairments, the ALJ must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523; 416.923. Even if the ALJ finds an impairment to be non-severe at step two, she is still required to analyze the effect of such non-severe impairment throughout the disability determination process. *Kobulnicky v. Astrue*, C.A. No. 11-1349, 2013 WL 1290955, at *7 (W.D. Pa. Mar. 27, 2013); *Brown v. Astrue*, C.A. No. 09-3737, 2010 WL 4455825, at *4 (E.D. Pa. Nov. 4, 2010).

Here, the ALJ correctly found that plaintiff's degenerative disc disease was severe. The ALJ based her findings on plaintiff's MRI results showing a small central protrusion and mild bulging, pain management treatment for lumbar facet syndrome and chronic lumber radiculopathy, and emergency room visits for treatment of back pain with injections of Dilaudid. (D.I. 12 at 11.)

The ALJ also correctly found plaintiff's obstructive sleep apnea to be a non-severe impairment. She explained that a single unsigned sleep study recommending further observations could not support a contrary finding, absent evidence that plaintiff's condition "impose[d] any significant restrictions on [her] ability to perform basic work activities." (Id.) Plaintiff erroneously argues that the ALJ failed to consider the effects of sleep apnea, such as drowsiness, day-time somnolence, fatigue, and disruption of sleep patterns throughout the disability determination process. Based on the medical records and the testimony of plaintiff and Coles, the ALJ concluded that plaintiff's sleep apnea symptoms were caused by medications and addressed those symptoms when evaluating the cognitive and mental aspects of plaintiff's dysthymia. (Id. at 17, 12-14.)

The ALJ found that plaintiff suffered from severe dysthymia. (Id. at 11-12.) The ALJ's finding is supported by substantial evidence, including Dr. Gorgui's prescriptions of anti-depressant and anxiety medications in March 2008, counseling records indicating a prior history of depression and treatment for this condition, and self-reported symptoms of anxiety, depression, mood swings, hyperactive and manic states, panic attacks, phobias, paranoia, delusion, anger, post-traumatic stress, sleep pattern disturbance, loss of appetite, fatigue, low energy, isolation, and frequent tearfulness. (Id. at 12.)

### 2. Step three

At step three, an ALJ determines whether the claimant's severe impairment or a combination of impairments meets or medically equals the impairments listed in 20 C.F.R. § 404, Subpart P, app. 1. 20 C.F.R. § 404.1520(d). An impairment matches a listing if it meets all of the specified medical criteria; an impairment that manifests only

22

some of those criteria, no matter how severe, does not qualify. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

Here, the ALJ thoroughly compared plaintiff's impairments with those listed in 20 C.F.R. § 404, Subpart P, app. 1. To meet or equal Listing 1.04 ("Disorders of the Spine"), a degenerative disc disease must result "in compromise of a nerve root or spinal cord . . . " with evidence of (1) nerve root compression, (2) spinal arachnoiditis, or (3) lumbar spinal stenosis resulting in inability to ambulate effectively. 20 C.F.R. § 404, Subpart P, app. 1. The ALJ correctly found that plaintiff's degenerative disc disease did not match Listing 1.04 in the absence of lumbar root compromise, nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in inability to ambulate effectively. (D.I. 12 at 12.) The ALJ also noted in her decision that treatment for plaintiff's back complaints was conservative, and no surgery was recommended. (*Id*. at 17.)

Similarly, plaintiff's dysthymia did not meet or equal the listings. Dysthymia is evaluated under Listing 12 ("Mental Disorders"). To satisfy Listing 12, mental impairments must result in two of the following: marked restriction of activities of daily living; marked difficulties in social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompression. 20 C.F.R. § 404, Subpart P, app. 1. The ALJ correctly concluded that plaintiff experienced only mild difficulties in her daily activities because she did not require assistance with personal hygiene, cooked simple meals, shopped for groceries twice a month, and attended church weekly. (D.I. 12 at 12; *see also id*. at 26, 32-33.) Plaintiff's difficulties in social functioning were mild because she interacted with her family and community;

23

her isolation was due to back pain. (*Id.* at 13.) Plaintiff had no marked cognitive problems: Keyes' testing revealed that her working memory was in the borderline range but her organizational and visual-spacial skills were in the normal range, and plaintiff reported an ability to read and watch TV. (*Id.*; *see also id.* at 32-34, 363-34.) Lastly, plaintiff never experienced episodes of decompression or decompensation. (*Id.* at 13.)

### 3. Step five

At step five, an ALJ determines if there is a significant number of jobs in the national economy for individuals with the claimant's age, education, work experience, and RFC. 20 C.F.R. §§ 404.1560; 416.960. To ascertain the claimant's RFC, the ALJ must pose a hypothetical "accurately convey[ing]" all of the claimant's "credibly established limitations" to an independent vocational expert. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis omitted).

Here, the ALJ correctly determined that plaintiff is limited to unskilled sedentary work. At the alleged disability onset date of 2007, plaintiff was forty-three years old, making her a younger individual. (D.I. 12 at 19.) Her education was beyond the high school level and included two and a half years of college. (*Id.; see also id.* at 26.) Plaintiff, however, could not return to her prior employment due to her physical and mental limitations. (*Id.* at 14.) Again, contrary to plaintiff's allegations, the ALJ considered all of plaintiff's credible limitations, including not only pain and depression, but also the effects of medication. (*Id.*)

Testimony of the VE confirmed that plaintiff could perform sedentary work in such positions as assembler, order clerk, and inspector. (*Id.* at 20; *see also id.* at 50-52.) The VE verified a significant number of jobs fitting plaintiff's RFC, that is, 400 local

24

jobs and between 70,000 to 90,000 positions nationally for each occupation. (*Id.* at 20.) The ALJ did not err when she disregarded the VE's answers to her second hypothetical. The second hypothetical encompassed all of plaintiff's subjective complaints, including those unsupported or inconsistent with the record. The first hypothetical, however, accurately reflected plaintiff's limitations supported by the record.

Accordingly, substantial evidence supports the ALJ's assessment of plaintiff's restrictions resulting in the proper finding that plaintiff is not disabled and not entitled to DIB and SSI.

## V.    CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgement is granted.

Dated October 24, 2014

UNITED STATES DISTRICT JUDGE